# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2025 ND 50

Nathan Zent,                                                                           Appellant

v.

North Dakota Department
of Health and Human Services,                                          Appellee

## No. 20240222

Appeal from the District Court of Stark County, Southwest Judicial District, the Honorable William A. Herauf, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice.

Micah J. Olson, Bismarck, N.D., for appellant.

Tiffany J. Grossman, Assistant Attorney General, Bismarck, N.D., for appellee.

Amy E. Scherer, Washington, D.C., and Micah J. Olson, Bismarck, N.D., for Amicus Curiae National Disability Rights Network in support of appellant.

Tammy P. Oltz, St. Paul, Minnesota, and Kylie Oversen, Fargo, N.D., Amicus Curiae in support of appellant.

**Zent v. NDDHHS**
**No. 20240222**

**Tufte, Justice.**

[¶1]   Nathan Zent appeals from a district court's order for judgment affirming an administrative law judge's findings of fact, conclusions of law, and order that affirmed the decision of the Division of Vocational Rehabilitation of the North Dakota Department of Health and Human Services (DHHS) to discontinue Zent's services. On appeal, Zent argues that: (1) DHHS's decision was based on an erroneous construction of the statutes and regulations governing VR's services; and (2) the ALJ applied the incorrect standard of proof in affirming DHHS's decision. We affirm the district court's judgment affirming DHHS's decision.

I

A

[¶2]   Zent has spastic quadriplegic cerebral palsy, a neuromuscular condition that affects his limbs, face, and trunk. The condition significantly impacts Zent's gross and fine motor skills. Zent relies on a motorized wheelchair for mobility and has difficulty controlling his arm and hand movement. The condition also affects Zent's speech; he can speak short phrases but otherwise communicates via an iPad with text-to-speech assistive technology. Zent can independently type three to four words per minute using his iPad and predictive text. The condition does not, however, affect Zent's ability to think or process information. Zent's physician of over twenty years, a pediatric rehabilitation medicine specialist, testified: "his cognitive skills are quite excellent as best I can tell."

[¶3]   Zent has been a student at Dickinson State University (DSU) since the fall semester of 2015. He is pursuing a Bachelor of Arts in English with a Political Science Minor. Zent takes two classes per semester, and at the time of the administrative hearing in October 2023, he had three semesters left to complete his degree.

1

[¶4] Zent has excelled academically at DSU. Four DSU faculty members testified in support of Zent's abilities. Each had had Zent as a student, and two had also served as Zent's academic advisor. They testified that Zent's work was excellent, that he earned an A in the courses he took with them, and that he was consistently one of the strongest students in the class. Zent completed all assignments on time or early. They each also testified to Zent's ability to communicate with faculty and peers. Zent actively participated in class discussions and communicated with faculty both in person and via e-mail. Although Zent would sometimes present prepared statements for discussion, he also communicated in real-time using his own voice.

[¶5] Zent intends to pursue a career as a journalist or writer. To that end, he has published twelve articles: ten in the Heart River Voice, a monthly community newspaper in Dickinson, and two in Dakota Catholic Action. Three of the articles were "feature articles" that Zent wrote during a summer internship with the Heart River Voice. The publisher of the Heart River Voice testified that Zent has always submitted his work on or before the deadline. She described his work as "exceptional" and better than some of her other regular contributors.

B

[¶6] DHHS administers vocational rehabilitation services with federal funding through the State Vocational Rehabilitation Services Program. 29 U.S.C. 720 et. seq.; N.D.C.C. ch. 50-06.1. The State Rehabilitation Services Program is authorized by the Rehabilitation Act of 1973 ("Act"), as amended by Title IV of the Workforce Innovation and Opportunity Act. 29 U.S.C. 701 et seq., amended by Pub. L. No. 113-128, tit. IV (2014).

[¶7] The purpose of the State Rehabilitation Services Program "is to assist States in operating statewide comprehensive, coordinated, effective, efficient, and accountable programs of vocational rehabilitation, each of which is: (A) an integral part of a statewide workforce development system; and (B) designed to assess, plan, develop, and provide vocational rehabilitation services for individuals with disabilities, consistent with their strengths, resources, priorities, concerns, abilities, capabilities, interests, informed choice, and

2

economic self-sufficiency, so that such individuals may prepare for and engage in gainful employment." 29 U.S.C. § 720(a)(2). Congress delegated rulemaking authority to the Secretary of Education to administer and ensure compliance with the Act. 29 U.S.C. § 709(c). Regulations promulgated by the Secretary of Education in administration of the Act are codified in part 361 of title 34 of the Code of Federal Regulations. 34 C.F.R. pt. 361.

[¶8] North Dakota accepted the provisions and benefits of the Act and designated DHHS as the state agency responsible for administering vocational rehabilitation services in accordance with the Act. 34 C.F.R. § 361.13; N.D.C.C. § 50-06.1-02; N.D. Admin. Code § 75-08-01-02. The North Dakota Division of Vocational Rehabilitation is the subunit of DHHS specifically tasked with carrying out North Dakota's VR program. N.D.C.C. §§ 50-06.1-05, 50-06.1-06. DHHS has rulemaking authority to "adopt rules necessary to carry out the responsibilities of the department in conformity with any statute administered or enforced by the department." N.D.C.C. § 50-06-16. Rules promulgated by DHHS in administration of the VR program are codified in N.D. Admin. Code ch. 75-08-01.

[¶9] The primary purpose of the VR program is to help individuals with disabilities "to prepare for and achieve an employment outcome." An employment outcome means:

a. Entering, advancing in, or retaining full-time or, if appropriate, part-time competitive employment in the integrated market;

b. Supported employment; or

c. Satisfying any other type of employment in an integrated setting that is consistent with the individual's strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, including self-employment, telecommuting, and business ownership.

N.D. Admin. Code § 75-08-01-01(7). An individual with a disability enjoys a presumption of eligibility for VR services. N.D. Admin. Code § 75-08-01-17. Once an applicant for VR services is determined eligible, the Division works with the

3

individual to develop an individualized plan for employment ("IPE"). 34 C.F.R. § 361.45; N.D. Admin. Code § 75-08-01-24. The IPE must include: (1) "[a] specific employment outcome in an integrated setting, which must be consistent with the unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the individual," and (2) the specific VR services to be provided, including assistive technology and personal assistance services. N.D. Admin. Code § 75-08-01-24(10); 34 C.F.R. § 361.46(a)(1) (An IPE "must [i]nclude a description of the specific employment outcome . . . that is chosen by the eligible individual and is consistent with the individual's unique strengths, resources, priorities, concerns, abilities, capabilities, career interests, and informed choice consistent with the general goal of competitive integrated employment[.]"). The Division must review the IPE at least annually to assess the individual's progress toward the specified employment outcome. 34 C.F.R. § 361.45(d)(5); N.D. Admin. Code § 75-08-01-24(9).

[¶10] Zent received VR services from 2015, when he began his studies at DSU, until May 2023, when his IPE expired and the Division discontinued his services. Zent's IPE identified an employment outcome of journalist or writer, and the Division renewed its support of that employment outcome annually from 2015 to 2022. The Division provided Zent with a personal aide for five hours per day during the semester, for a total of 25 support hours per week. An aide supported Zent during class by helping to transcribe his words and facilitate his communication with professors and peers. When not in class, Zent and his aide worked from a study room while Zent completed his coursework. Zent can type and navigate his iPad independently, but he does so slowly, and at times with difficulty; the aide assisted Zent as needed with the logistics of completing his work, i.e., typing and transcribing his words, moving the cursor, and copy-pasting.

[¶11] The Division supported an employment outcome of journalist or writer for Zent until August 2022, when Zent's new VR case manager, Catherine Quintane, began to doubt the viability of that goal for Zent because of the amount of support he needed to complete his coursework. Zent had a different VR case manager until September 2021, when Quintane took over. Quintane originally supported journalist or writer as an employment outcome for Zent, and she

signed his IPE in May 2022. When Zent submitted his class schedule for fall 2022, however, Quintane became concerned that Zent had requested the same amount of support despite the fact that one of the two courses was an asynchronous online class. Quintane testified:

> And when I started asking about the levels of support, because Nathan was coming to school every single day and I'm looking at this going, But this is an asynchronous class, this is something he could be doing online, this is something he could be doing on his own time as he's available to do it. I was not understanding the supports that were being requested for this class. I began to take a look at things and I'm going, Wait a minute, the levels of support that he was needing to complete his classwork were significant. And when I looked at what it would take for him to be competitively employed for what he was going to school, the level of supports that he would need would not be supported in a work environment, that is when I began questioning, do we have the appropriate goal for him to be successful in paid integrated employment.

[¶12] Quintane then began researching whether an employment outcome of journalist or writer was appropriate for Zent given the amount of support he needed to complete his coursework. Quintane testified to four areas of concern she identified before ultimately concluding journalist or writer was an inappropriate employment outcome for Zent: (1) Zent's typing speed; (2) Zent's speech intelligibility; (3) the relative rarity and competitiveness of journalism and writing jobs; and (4) Zent's need for one-to-one support given his difficulties typing and speaking.

[¶13] Zent's typing speed was a primary concern for Quintane. She testified that from her research, she had concluded that professional writers are expected to type between fifty and eighty words per minute, whereas Zent can type three to four words per minute. Further, even if VR services were to provide Zent with EyeGaze technology—which was recommended by an Occupational Therapist—users of EyeGaze type twelve words per minute, at most, which would still fall significantly below the fifty words per minute minimum that Quintane had determined. Quintane further concluded, upon reviewing job postings for journalists and writers, that the ability to write quickly and meet short deadlines

was required. Zent's speech intelligibility, determined to be 50% for a novel listener, further inhibits his ability to communicate quickly and interact in real-time. Given the limited number of journalism and writing jobs in North Dakota and in the U.S. generally, Quintane concluded that Zent's limitations have an outsized impact on the viability of journalist or writer as an employment outcome for him.

[¶14] Quintane was especially concerned that Zent needed one-to-one support to complete his coursework and that the amount of supports he needed had not decreased since 2015. She was concerned that he needed twenty-five hours of one-to-one support of an aide per six credit hours. She testified that she concluded the employment outcome was inappropriate:

> The amount of supports that he needs is not a reasonable accommodation in an employment setting. He's getting one-to-one supports 100 percent of the time. I'm sorry. There's not — VR will not — there's not anyone that gets 100 percent supports. It's not something that an employer can do. It's not an expected reasonable accommodation. Without those 100 percent supports of having somebody help him do the things that he needs to do, to do the typing, to do all of those things, I just couldn't see it happening.

Alicia Halle, the assistant director of North Dakota's VR program, shared Quintane's concerns.

[¶15] Zent appealed the Division's decision to discontinue his VR services, and after a hearing, an ALJ affirmed. DHHS denied Zent's petition for reconsideration. Zent then sought review in the district court, which affirmed the ALJ's decision. Zent timely appealed to this Court. On appeal, Zent argues that DHHS's decision to discontinue Zent's services is based on a misapplication of the statutes and regulations governing VR services. Zent also argues the ALJ applied the incorrect standard of proof in affirming DHHS's decision.

II

A

[¶16] "Courts exercise limited review in appeals from administrative agency decisions. On appeal from the district court, we review the administrative agency's decision in the same manner that the district court reviewed the agency's decision. N.D.C.C. § 28-32-49." *Jahner v. North Dakota Dep't of Health & Hum. Servs.*, 2023 ND 71, ¶ 6, 989 N.W.2d 466. Under N.D.C.C. § 28-32-46, a district court must affirm an administrative agency's order unless:

1. The order is not in accordance with the law.
2. The order is in violation of the constitutional rights of the appellant.
3. The provisions of this chapter have not been complied with in the proceedings before the agency.
4. The rules or procedure of the agency have not afforded the appellant a fair hearing.
5. The findings of fact made by the agency are not supported by a preponderance of the evidence.
6. The conclusions of law and order of the agency are not supported by its findings of fact.
7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.
8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

N.D.C.C. § 28-32-46.

[¶17] "In reviewing the agency's findings of fact, this Court does not make independent findings or substitute our judgment for the agency's judgment. Rather, we decide whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence from the entire record. The application and interpretation of a statute is a question of law. Questions of law are fully reviewable in an administrative appeal." *Jahner*, 2023 ND 71, ¶ 7 (cleaned up).

7

[¶18] Zent argues DHHS's decision to discontinue his VR services was based on a misapplication of the statutes and regulations governing VR's services. The purpose of the State Vocational Rehabilitation Program is to assist states in providing vocational rehabilitation services to disabled individuals "so that they may prepare for and engage in competitive integrated employment and achieve economic self-sufficiency." 34 CFR § 361.1. DHHS discontinued Zent's VR services because it concluded that Zent is unlikely to achieve competitive integrated employment with an employment outcome of journalist or writer.

[¶19] The ALJ summarized DHHS's determination:

> The Department determined Zent is not able to work without one-to-one support all the time and that he does not have a viable goal. The Department determined he cannot work in the required, competitive integrated environment earning at least minimum wage because he would not be accommodated by an employer at the level he requires and he [is] unable to compete (i.e., get the ideas from his mind to paper in a timely manner), so as to earn minimum wage in an integrated employment situation. The Department determined the goal of a writer or author sets Zent up for failure in a competitive integrated employment setting. In short, although Zent can produce quality work, quantity of work [is] required to write in a competitive integrated employment setting.

The ALJ then affirmed DHHS's decision, concluding: "Although [Zent] pursuing employment as a journalist or author is consistent with his unique strengths, resources, priorities, concerns, abilities, capabilities, career interests and his informed choice, it is not consistent with the general goal of competitive integrated employment. The Division showed by the preponderance of the evidence that Zent cannot work in a competitive integrated environment as a freelance journalist or author."

[¶20] A central issue in this case is whether DHHS erred in determining that Zent's preferred employment outcome of writer or journalist is inconsistent with the goal of competitive integrated employment required for VR services. Under 34 C.F.R. § 361.5(c)(9), competitive integrated employment means work that:

(i)     Is performed on a full-time or part-time basis (including self-employment) and for which an individual is compensated at a rate that-

       (A)    Is not less than the higher of the rate specified in section 6(a)(1) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(a)(1)) or the rate required under the applicable State or local minimum wage law for the place of employment;

       (B)    Is not less than the customary rate paid by the employer for the same or similar work performed by other employees who are not individuals with disabilities and who are similarly situated in similar occupations by the same employer and who have similar training, experience, and skills; and

       (C)    In the case of an individual who is self-employed, yields an income that is comparable to the income received by other individuals who are not individuals with disabilities and who are self-employed in similar occupations or on similar tasks and who have similar training, experience, and skills; and

       (D)    Is eligible for the level of benefits provided to other employees; and

(ii)    Is at a location—

       (A)    Typically found in the community; and

       (B)    Where the employee with a disability interacts for the purpose of performing the duties of the position with other employees within the particular work unit and the entire work site, and, as appropriate to the work performed, other persons (*e.g.*, customers and vendors), who are not individuals with disabilities (not including supervisory personnel or individuals who are providing services to such employee) to the same extent that employees who are not individuals with disabilities and who are in comparable positions interact with these persons; and

(iii)   Presents, as appropriate, opportunities for advancement that are similar to those for other employees who are not individuals with disabilities and who have similar positions.

34 C.F.R. § 361.5(c)(9)(i). Whether a job position meets the requirements of competitive integrated employment is a determination that the Division must

9

make on a case-by-case basis. U.S. Dep't of Educ., Off. of Special Educ. & Rehab. Servs., Rehab. Servs. Admin., FAQ 21-03, "Criterion for an Integrated Employment Location in the Definition of 'Competitive Integrated Employment' and Participant Choice" (Mar. 8, 2021).

[¶21] This Court interprets regulations in the same manner as statutes:

> Administrative regulations are derivatives of statutes and are construed under rules of statutory construction. Statutory interpretation is a question of law, fully reviewable on appeal. The objective in interpreting regulations is to determine the drafter's intent by first looking at the language itself. Words are given their plain, ordinary, and commonly understood meaning, unless defined or unless a contrary intent plainly appears. Regulations are construed as a whole and are harmonized to give meaning to related provisions. If the relevant language is clear and unambiguous, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

*Blue Appaloosa, Inc. v. N.D. Indus. Comm'n*, 2022 ND 119, ¶ 8, 975 N.W.2d 578.

[¶22] The Act and its accompanying federal regulations clearly state that the provision of vocational rehabilitation services is premised on helping individuals with disabilities to achieve competitive integrated employment. An IPE "must [i]nclude a description of the specific employment outcome . . . that is chosen by the eligible individual and is consistent with the individual's unique strengths, resources, priorities, concerns, abilities, capabilities, career interests, and informed choice consistent with the general goal of competitive integrated employment[.]" 34 C.F.R. § 361.46(a)(1). "Whether an employment outcome is 'consistent' with the listed attributes ultimately is subject to the State's determination." *Reaves v. Missouri Dep't of Elementary & Secondary Educ.*, 422 F.3d 675, 680 (8th Cir. 2005). To satisfy the requirements of competitive integrated employment, a job position must meet each of the elements articulated under 34 C.F.R. § 361.5(c)(9). DHHS's determination that Zent's communication and typing difficulties preclude him from achieving competitive integrated employment as a journalist or writer is consistent with the plain language of the Act and corresponding regulations.

[¶23] Under 34 C.F.R. § 361.5(c)(9)(i), to constitute competitive integrated employment, a job position must provide certain minimum compensation. 34 C.F.R. § 361.5(c)(9)(i). In the case of hourly or salaried work, a job position must pay at least minimum wage. 34 C.F.R. § 361.5(c)(9)(i)(A). "In the case of an individual who is self-employed," a job position must "yield[] an income that is comparable to the income received by other individuals who are not individuals with disabilities and who are self-employed in similar occupations or on similar tasks and who have similar training, experience, and skills." 34 C.F.R. § 361.5(c)(9)(i)(C). DHHS determined that Zent's typing speed rendered him incapable of achieving competitive integrated employment as a freelance journalist or writer, because he is unable to produce articles at a rate that would earn "an income that is comparable to the income received by other individuals who are not individuals with disabilities." *Id.*

[¶24] Competitive integrated employment also requires that a job position be in an integrated setting "typically found in the community" and where an employee with a disability interacts with others to the same extent as non-disabled employees in similar positions. 34 C.F.R. § 361.5(c)(9)(ii). Zent relies on Department of Education guidance: "[t]o be 'typically found in the community,' an employment location setting should be: [f]ound in the competitive labor market; and [n]ot formed for the purpose of employing individuals with disabilities." U.S. Dep't of Educ., Off. of Special Educ. & Rehab. Servs., Rehab. Servs. Admin., FAQ 21-03, "Criterion for an Integrated Employment Location in the Definition of 'Competitive Integrated Employment' and Participant Choice," Q7 (Mar. 8, 2021) (citing 62 Fed. Reg. 6310–11 (Feb. 11, 1997); 81 Fed. Reg. 55642–43 (Aug. 19, 2016)). Although freelance journalist jobs as well as full- and part-time positions are "[t]ypically found in the community," Zent's communication difficulties preclude him from interacting "to the same extent [as] employees who are not individuals with disabilities and who are in comparable positions interact with these persons." 34 C.F.R. § 361.5(c)(9)(ii)(A)–(B). Zent speaks very slowly and with difficulty; his speech intelligibility, determined to be 50% for a novel listener, renders him unable to communicate quickly and effectively in real-time. DHHS determined that Zent's communication difficulties prevent him

11

from interacting with others—whether other employees or the subjects of articles—to the same extent as similarly employed individuals.

[¶25] DHHS's determination that Zent's preferred employment outcome of writer or journalist does not meet the requirements of competitive integrated employment is consistent with the plain language of 34 C.F.R. § 361.5(c)(9) and supported by a preponderance of the evidence. We conclude DHHS did not misapply the statutes and regulations governing VR services in determining that Zent's chosen employment outcome of journalist or writer was inconsistent with the goal of competitive integrated employment.

[¶26] In reviewing DHHS's resolution of factual disputes, "[w]e will only reverse if the agency's findings are not supported by a preponderance of the evidence and must affirm if a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Rennich ex rel. Rennich v. N.D. Dep't of Hum. Servs.*, 2008 ND 171, ¶ 11, 756 N.W.2d 182 (cleaned up). We conclude that a reasoning mind reasonably could decide the weight of the evidence from the entire record supports DHHS's finding that Zent's chosen employment outcome is not consistent with the general goal of competitive integrated employment.

III

[¶27] Zent argues the ALJ applied the incorrect standard of proof. Zent argues that under N.D. Admin. Code §§ 75-08-01-17(3) and 75-08-01-18(1)(c), a clear and convincing standard applies in VR cases, and that the ALJ thus erred in applying a preponderance of the evidence standard. This argument is without merit.

[¶28] The clear and convincing standard applies only to eligibility determinations for VR services. Both 34 C.F.R. pt. 361 and N.D. Admin. Code § 75-08-01 provide that the state agency designated to provide VR services must show by clear and convincing evidence that an individual is incapable of benefiting from VR services because of the severity of the individual's disability. 34 C.F.R. 361.42(e)(2)(iii)(B); 34 C.F.R. 361.57(g)(3)(ii); N.D. Admin. Code §§ 75-08-01-17(3); 75-08-01-18(1)(c). For all other agency determinations, the preponderance of the evidence standard applies. N.D.C.C. § 28-32-46(5).

12

[¶29] DHHS has determined that Zent is eligible for VR services. Because the hearing dealt with Zent's employment outcome and not his eligibility for VR services generally, the ALJ did not err in applying a preponderance of the evidence standard.

IV

[¶30] We affirm the district court's judgment affirming DHHS's decision.

[¶31] Jon J. Jensen, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Douglas A. Bahr